IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BART HERRON, OLGA HERRON, S.H. and
D.H. through their guardian OLGA HERRON,

                    Plaintiffs,

      v.

WELLS FARGO FINANCIAL, INC., a foreign
corporation,

—————————————Defendant.—————————

CV-05-659-ST

FINDINGS AND
RECOMMENDATIONS

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiffs, Bart Herron ("Herron"), his wife Olga Herron, and his children S.H. and D.H.

(through their guardian Olga Herron), allege the following claims against defendant, Well Fargo

Financial, Inc. ("WFF"), arising out of an alleged employment contract between Herron and

1 - FINDINGS AND RECOMMENDATIONS

WFF:  breach of contract (First and Fourth Claims),[1] fraud in the inducement (Second Claim), fraud in the factum (Third Claim), breach of covenant or duty of good faith and fair dealing (Fifth Claim) and discrimination under 42 USC § 1981 (Sixth Claim).  They seek damages in the amount of $250,000 for lost income to the date of filing suit, $7,250,000 for future lost income, plus punitive damages on the fraud claims.

This court has both diversity and federal question jurisdiction pursuant to 28 USC §§ 1331 and 1332(a)(1).

WFF filed a Motion for Summary Judgment (docket #47) seeking dismissal of all claims. In response, the Herrons filed a Cross-Motion for Summary Judgment (docket #52) and an Amended Cross-Motion for Summary Judgment (docket #56).  For the reasons that follow, WFF's motion should be granted and the Herrons' motions should be denied.

## <u>LEGAL STANDARDS</u>

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law."  The moving party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial."  *Balint v. Carson City*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact.

---

[1] The Fourth Claim is the same as the First Claim and appears to be a drafting error.

2 - FINDINGS AND RECOMMENDATIONS

*United Steel Workers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 631 (9th Cir 1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted). Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id* at 631.

## FACTS

A review of the parties' facts, as well as the other materials submitted by the parties, including affidavits, declarations, and deposition excerpts,[2] reveals the following facts:

Herron is an attorney who graduated from law school in 1998 and was admitted to practice in the state of Oregon that same year. Herron Aff, ¶ 1; Herron Depo I, p. 17. He opened a solo law practice as soon as he was admitted into the bar and practices mostly criminal defense law, including representation of clients for the Clackamas County Indigent Defense Corporation ("CIDC"). Herron Depo I, pp. 21, 98; Herron Depo II, pp. 21-22.

The current dispute arises from an interaction between Herron and Scott Turner ("Turner"), a WFF employee. Turner is a division manager and senior vice president at WFF. Turner Decl, ¶ 1. He is responsible for assisting in the execution of WFF's business model relating to consumer lending in a substantial portion of the Western United States and the

---

[2] Both parties have submitted documents with various attachments. Citations to affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit, declaration or page(s) of the deposition transcript. All other citations are to the exhibit number of the parties' submissions.

Commonwealth of the Northern Mariana Islands ("CNMI"), including a branch located in Saipan.  *Id* at ¶ 2.

## I.    May 6, 2004 Meeting at the Casino

Herron and Turner met on the evening of May 6, 2004, while playing blackjack at the New Phoenix casino in La Center, Washington.  *Id* at ¶10.  Herron was a regular at the New Phoenix casino, having been there between 50 and 70 times.  Herron Depo I, p. 79.  Turner had come on a personal trip from his home in Orange County, California, to attend his uncle's funeral the next day in Longview, Washington.  Turner Decl, ¶ 8.

Herron and Turner give polar opposite accounts of their conversation that evening.

### A.    Herron's Account

Turner started talking to Herron while they were both playing blackjack at a $25 minimum table.  Herron Depo I, pp. 95-96, 98.  Herron told Turner he was a trial lawyer.  *Id* at 96.  They had a discussion about trials, and Herron explained that he practiced mostly criminal law.  *Id* at 97-98.  Turner told Herron that he was a senior vice-president at WFF and that thousands of people worked under him.  *Id* at 104, 165.  After socializing for a while, Turner offered Herron a job as an attorney working with WFF in Saipan.  *Id* at 133-34; Herron Aff, ¶ 8. He represented to Herron that he was completely in charge of WFF's business expansion in Saipan, including the "Saipan project."  Herron Depo I, pp. 103-04, 187-90; Herron Aff, ¶ 32.

In his job offer, Turner guaranteed Herron's employment for one year at a salary of $250,000, and stated that if Herron "could win in court," he would have a job with WFF for the rest of his life.  Herron Depo I, pp. 77, 146, 156, 158, 159, 167.  Turner explained that he did not have any good trial lawyers in Saipan, as they lost a lot.  *Id* at 195.  When asked whether he can

win in court, Herron answered "yeah, I think I can." *Id.* Herron's main duty would be to work

on the "Saipan project," *i.e.* to draft a revision of the lending law in Saipan in order to make it

more lender friendly and to lobby the governor and the legislators to adopt the revision into law.

*Id* at 163-64, 179; Herron Aff, ¶¶ 9, 11, 17. Turner said he believed Herron had the social skills

to be successful in lobbying the CNMI governor and legislature to change the law. Herron

Depo I, pp. 135, 145; Herron Aff, ¶ 13. Turner also wanted him to take over the legal

department in CNMI that was being handled by local counsel. Herron Depo I, pp. 145-46, 156;

Herron Aff, ¶ 16.

Turner asked Herron to start working on the revision of the CNMI lending law

immediately. Herron Depo I, pp. 71-72, 166, 231-32; Herron Aff, ¶ 12. Turner said this "had to

be done fast, fast," that it was urgent and that he was to begin working "now." Herron Depo I,

pp. 145, 189; Herron Depo II, pp. 61-62. In response to Herron's inquiry about when he would

be leaving for Saipan, Turner responded that he would go back to his office and make the

arrangements. Herron Depo I, p. 166. Herron admitted he did not know all the details and

thought at some point he would fly down to Los Angeles to go over all the details with Turner.

*Id* at 185-85, 229. Herron understood that he would go to Saipan when Turner said so. *Id* at

243. Herron agreed to a one-year contract: "[a]t least for a year I would be *in Saipan* without

any worry about a job. If I did well, I would always have a job. If I didn't do well, I would be

cut loose." *Id* at 76 (emphasis added). The parties agreed that California law would govern their

agreement. Herron Depo II, pp. 58-59. The parties did not discuss whether Herron would be an

employee or an independent contractor, but Herron did not care what his status was. Herron

Depo I, pp. 234-35.

5 - FINDINGS AND RECOMMENDATIONS

"Later in the conversation" (*id* at 74-75), after Herron had accepted the offer (*id* at 148), Turner asked him for a two-year commitment "almost as an afterthought." *Id* at 147, 149. Turner first brought up the two-year commitment inside the casino (*id* at 176) and then repeated it outside, although Herron did not know why. *Id* at 176, 190-91, 269. He wanted the two-year commitment "in order to justify the expense of sending [Herron]." *Id* at 159. Herron agreed to commit to two years. *Id*. Nevertheless, he understood that his job was only guaranteed for one year, and that if he did not perform well after one year, he would be looking for another job. *Id*. Herron thought there were two contracts: one for one year and one for two years. *Id* at 155.

Turner did not appear intoxicated during the approximately two hours Herron spent with him that evening. *Id* at 164; Herron Aff, ¶ 28. Herron only saw Turner with one drink which he did not finish. Herron Aff, ¶ 28. Outside the casino, Turner asked Herron to call him the next day and gave Herron his cell phone number and business card. Herron Depo I, p. 174.

After Turner drove away, Herron called his wife and left a message that he got a job with a $250,000 salary, that the job had been confirmed by the senior vice-president of WFF, and that she should pack her bathing suit. *Id* at 197, 200. When he got home, Herron and his wife celebrated and started packing. *Id* at 212.

**B.    Turner's Account**

According to Turner, he is an alcoholic who has been able, for the most part, to abstain from drinking. Turner Decl, ¶ 3. On several occasions, however, he has engaged in binge drinking, waking up with little recollection of what had happened while he was intoxicated. *Id.* On the evening he met Herron, Turner had been drinking alcohol; he had several drinks on the plane, drank alcohol at a casino in La Center, and continued to drink at the New Phoenix casino

6 - FINDINGS AND RECOMMENDATIONS

and later that night at his hotel. *Id* at ¶¶ 9, 11. Turner remembers playing blackjack and talking

to Herron at the New Phoenix. *Id* at ¶ 10. However, he does not recall any discussion that night

about hiring Herron to work at WFF in Saipan or anywhere else and does not believe such a

discussion took place. *Id* at ¶ 12. He believes that his intoxication impaired his memory.

Turner Depo, p. 53.

Turner has not participated in hiring any in-house lawyers for WFF and has had limited

involvement in engaging and interacting with outside counsel that have been retained from time

to time in the region of Saipan. Turner Decl, ¶ 7. From around 1998 to 2001, WFF hired an

outside attorney named Robert O'Connell to draft and lobby for the passage of a consumer

lending law that would allow WFF to make loans in the CNMI, but Turner is unaware of any

efforts to have that law revised. *Id* at ¶ 6. He is also unaware of WFF's involvement in any trial

in the CNMI since it opened its branch there in 1997. *Id* at ¶ 7. In fact, to his knowledge, WFF

has not hired in-house counsel in Saipan or the CNMI since it opened its branch there, nor has it

ever contemplated hiring an in-house counsel in Saipan or the CNMI. *Id* at ¶ 13.

## C.   Ross Felton's Testimony

Ross Felton ("Felton") is a former employee of the New Phoenix Casino who was

working as a breaker on the casino floor on the evening of May 6, 2004. Felton Depo, p. 8.

Felton knew Herron as a regular patron at the casino, knew that Herron usually tried to get a

table by himself and liked to be quiet when he gambled, but on the evening of May 6, 2004,

Felton noticed that Herron was sharing a table with an older gentleman (Turner). *Id* at 8, 34-35.

Felton explained that it was his job to pay more attention to the table that Herron and Turner

shared, as they were gambling at a table with higher stakes. *Id* at 8-10. He overheard portions of

the conversation between Herron and Turner.  Turner was getting excited and was talking to

Herron about business.  At some point it came up that Herron was an attorney.  Turner said that

Herron was just the man they were looking for and asked Herron for a business card, which

Herron handed to him.  *Id* at 10-12, 33.

Felton briefly talked to both Herron and Turner, congratulating Turner on winning a

couple of hands.  *Id* at 10.  He did not see any signs of intoxication on Turner.  *Id* at 10-11,

14-16.  Felton had undergone extensive training to detect signs of intoxication in patrons.  *Id* at

10-11, 16-20.  Had he seen Turner start to get intoxicated, he would have been required to alert

the wait staff to keep an eye on him, and would have been responsible for calling a "cut-off," *i.e.*

instructing the patron that he was not allowed to drink or gamble anymore.  *Id* at 15.  He also

testified that police cars patrolled an area of about two blocks around the casinos, monitoring the

traffic coming in and out of the casinos to watch for drunk drivers.  *Id* at 23-25.  Felton had

never arrived to work or left work without seeing a police officer there.  *Id* at 23-24.

### D.    Mrs. Herron's Testimony

Mrs. Herron was not present at the casino on May 6, 2004, but received several voice

mails from her husband that evening.  The first one said that Herron had met a Wells Fargo

senior vice president who had offered Herron a job in Saipan paying $250,000.  Olga Herron

Depo, p. 36.  Mrs. Herron did not know what Saipan was.  *Id.*  A couple of hours later, around

midnight or 1:00 a.m., she received another voice message from her husband, asking where she

was and telling her that he needed to talk to her, that he hoped it was okay that he had accepted

the job offer, and that she should pack her bathing suit.  *Id* at 44.  She did not call her husband

back; instead she waited for him to come home.  *Id* at 45.

8 - FINDINGS AND RECOMMENDATIONS

II.    **May 7, 2004 Phone Call**

A.    **Herron's Account**

The day after their encounter at the casino, Herron called Turner at around 2:00 p.m and talked to him for about 10 minutes.  Herron Depo I, pp. 220-21, 244-45.  Herron confirmed the terms of the contract during the phone call.  *Id* at 220.  Turner added that Herron would be paid $250,000 per year because that was about what WFF was paying local counsel.  *Id* at 221.  Turner told Herron he was going to talk to the CEO about Herron's job in order to "go over," "confirm," or "clarify" all the details.[3]  *Id* at 222, 225, 229.  Herron recognized that the CEO could cause a potential problem and possibly disagree with Turner's hiring decision, but he was not concerned about it.  *Id* at 223, 226-227.  Turner also told Herron that his departure date needed to be moved back to the third quarter because he was going to be busy.  *Id* at 232.  Herron was asked to start researching and writing the lender law right away.  *Id* at 231.  Before he hung up, Turner reiterated his request that Herron commit to two years, to which Herron agreed.  *Id* at 232.

Turner said he would call Herron when he returned to his office.  *Id* at 229.  Although Turner was silent about this, Herron believed that Turner would have him travel to Los Angeles to go over "all the intricate details" of his job responsibilities and about Saipan.  *Id* at 229.  Herron thought there would be some paperwork associated with WFF employment.  Herron Depo II, p. 62.  When asked whether he ever wondered about the need for an employer to check the immigration status of an employee before the employee can start work, Herron stated he was not aware of such requirements because "I've never hired anybody."  Herron Depo I, p. 234.

_____

[3] Herron could not remember exactly which words Turner used.  Herron Depo I, p. 225.

9 - FINDINGS AND RECOMMENDATIONS

B. **Turner's Account**

On May 7, 2004, Turner was awakened by a phone call from Herron. Turner Depo, p.
57. He felt disoriented and confused because he had been drinking the night before. *Id.* He was
no longer intoxicated. *Id* at 70. When Herron said he was the person Turner had talked to the
night before, Turner asked for his name and the spelling of the name. *Id* at 57. He could not
recall the conversation and did not know who Herron was. *Id* at 58. However, he remembered
that the night before, Herron had told him he was an attorney. *Id* at 66. He also had a vague
recollection that Herron's wife was Russian and that he and Herron had talked about Saipan
which has some Russian contract workers. *Id* at 59, 61.

Herron explained that Turner had offered him a job as a staff attorney in Saipan, and
Turner responded that it must have been the alcohol. *Id* at 57, 117. At this point, Herron replied
that somebody in Turner's position should not make promises like this if he does not intend to
keep them. *Id.* Turner became "terrified," perceiving an implied threat in Herron's words. *Id.*
He told Herron that he would have to look into the feasibility of it and have the financial
planning and analysis department review it before he could get back to him. *Id.* He was trying
to buy some time to find a way to tell Herron that there was no job because he was extremely
concerned that Herron was going to reveal his drinking to his employer, thereby jeopardizing his
job and retirement. *Id* at 58; Turner Decl, ¶ 14.

///

///

III. **May 7, 2004 Email**

10 - FINDINGS AND RECOMMENDATIONS

On the evening of May 7, 2004, Herron sent Turner a "thank you" email which reiterated why he was a good person for the job, in case Turner wanted something to show to the CEO when he talked to him about Herron.  Herron Depo I, p. 222; Buchanan Decl, Ex 7, pp. 1-2 (copy of the email).  Turner thanked Herron for his email and said he would get back to him the following week.  Buchanan Decl, Ex 7, p. 1.

**IV.    <u>Subsequent Events</u>**

Turner did not call Herron the following week.  Herron Depo I, pp. 115-16.  On May 19, 2004, Turner left a voice mail on Herron's answering machine, apologizing for not getting back to him earlier because of another family emergency, stating that he was on business in Chicago and that he hoped to touch base with Herron on the following Monday when he got back to his office.  *Id* at 241-42, 247-48; Herron Second Decl, Exs 1 & 3.

Turner remembered that in a May 19 or 20, 2004 phone call, he had told Herron that he was going to talk to his supervisors about the possibility of Herron coming to work for WFF.  Turner Depo, pp. 72-73.  He had no intention of hiring Herron, but was simply trying "to let [him] down easy," as he was concerned about the potential for adverse action.  *Id* at 72-73.  Turner did not discuss the subject of Herron at that meeting.  *Id* at 83.

The next communication between the two was on May 27, 2004, when Herron sent Turner an email message containing his contact information (address and phone number) in case Turner had lost it.  Herron Depo I, pp. 249-50.  In a phone conversation that same day, Turner told Herron that the CEO had decided to cancel expansion in the CNMI because of pressure from consumer groups about predatory lending, and instead had decided to continue expansion in the contiguous United States.  *Id* at 250-53, 255.

11 - FINDINGS AND RECOMMENDATIONS

On May 29, 2004, Herron emailed Turner about the phone conversation in which Turner had told him there was no job.  Herron Third Decl, Ex 8, pp 1-2.  He expressed hope that the job "is really still there for [him]" and that he was just being tested.  *Id*.  In his view, "[t]here is no doubt that we formed a legal contract for my employment with [WFF], consisting of the following terms . . ."  *Id*.  He proceeded to "summarize" the "multiple agreements" in one summary (Herron Depo I, pp. 154, 265-66), listing terms such as job duties, pay ($250,000 per year), duration ("[m]inimum two year commitment"), start date ("[t]hird [q]uarter") and moving and start-up expenses ("[p]aid by Wells Fargo").  Herron Third Decl, Ex 8, pp 1-2.  He continued:

> You are a senior officer of [WFF] and, therefore, have full authority to legally bind the corporation.  At no time did you state that your authority to hire for [WFF] was limited or that the offer was contingent on anything.  I accepted your offer.  Thus we have a contract for a minimum of two years.  If forced to sue, I would ask the jury to determine the duration of time - beyond two years - that I would have "more likely than not" continued to handle the legal affairs of Wells Fargo in these tropical islands, arguably:  twenty years.

*Id* at 2.

Contrary to his statement that "we have a contract for a minimum of two years," Herron later explained in his deposition that he did not intend this email to be any kind of legal statement and that the phrase he wrote is not a correct statement.  Herron Depo I, p. 268.  Herron understood that there were two contracts: "one for a year and one for two years."  *Id* at 155.  Herron believed Turner was "slick enough in employment law that he tried to make sure that the contract was one-sided so that [Herron] would have to do everything, but [Turner] could get out of it if he wanted to, I think the two-year issue was about."  Herron Depo II, p. 74.

12 - FINDINGS AND RECOMMENDATIONS

Also on May 29, 2004, Turner responded by email that he was not testing Herron and did not have a job for Herron in Saipan.  Herron Third Decl, Ex 8, p. 1.  He added that "[w]e are not expanding in the CNMI at this time.  I once thought that we were.  When I last talked to you I thought there maybe [*sic*] a possibility.  I am sorry you are disappointed."  *Id*.  In a later email response that same day, Turner said: "Bart.  Please don't do this."  Buchanan Decl, Ex 8, p. 1.

An undated recording captured an unauthenticated phone call from Herron to Turner. Herron Second Decl, Ex 2.[4]  Herron stated that he talked to his wife and that turning down $250,000 was a very hard thing to do.  *Id*.  After reiterating that Turner had previously told him that the CEO had decided to cancel WFF's expansion in CNMI, Herron asked whether there had ever been a job in Saipan,  *Id*.  Turner admitted that there was no job in Saipan and had never been a job there for Herron.  *Id.*

In a June 18, 2004 email to Turner, Herron wrote:

> I received your email and would be happy to talk to you.  Maybe we can come up with a creative solution for both of us.
> I accept your statements that the CEO of [WFF] decided to expand in the contiguous United States instead of the CNMI, and that this is why you repudiated our agreements (a one year contract - which we negotiated inside the building, and a second one year contract - which we negotiated outside the building: the terms of both being the same concerning payment and my responsibilities, as outlined in our previous correspondances [sic].) Further, I accept your repudiations and know that that [sic] they were unequivocal - **although I really do wish these statements only had been a "test", because I truly did want the work.**
> If something has changed and the Saipan Project can go forward, please let me know at once and we will negotiate how to make it happen.  If you have another offer or idea, then I will listen.

_____

[4] Only the tape recording of the telephone conversation was offered by the Herrons.  *See* Herron Second Decl, Ex 2. There is no transcript of the recording in the record.

Herron Third Decl, Ex 9 (emphasis in original).  Turner responded within minutes, asking: "Can you call me now?"  *Id.*

In June or July 2004, Turner told his superiors, including his direct supervisor, David Kvamme ("Kvamme"), about Herron.  Buchanan Decl, Ex 6, p. 4.  He claimed Herron had been trying to extort money from him and was threatening litigation.  *Id.*  Kvamme had been aware that Turner was an alcoholic since approximately 2000 or 2001.  *Id* at 3.  After Turner became intoxicated at a leadership conference in March 2004, Kvamme discussed the incident with Turner, who believed he had his problem under control.  *Id* at 4.  Kvamme told Turner the matter would be handled by WFF's in-house counsel and that he should have no further communications with Herron.  *Id* at 5.

## DISCUSSION

WFF moves for summary judgment dismissing the Herrons' claims on the basis that: (1) Oregon law applies to the dispute; (2) the contract claims fail due to lack of mutual assent, indefinite terms, and the statute of frauds; (3) the fraud claims fail due to lack of clear and convincing evidence; (4) the racial discrimination claim fails due to lack of a *prima facie* case; and (5) Mrs. Herron and the Herron children lack standing.

The Herrons also move for summary judgment, arguing that each of their claims is supported by undisputed material facts establishing each element.

///

///

## I.    The Herrons' Cross-Motions for Summary Judgment

14 - FINDINGS AND RECOMMENDATIONS

On February 17, 2006, this court granted in part and denied in part the Herrons' motion to enlarge time (docket # 41) and set a new deadline of March 7, 2006, for filing dispositive motions. *See* docket # 46. The Herrons filed their Cross-Motion for Summary Judgment on March 21, 2006, and their Amended Cross-Motion for Summary Judgment the next day. *See* dockets # 52 and # 56. Because the Herrons missed the March 7, 2006 deadline which was extended at their request, their motions should be denied as untimely filed.

## II.    WFF's Motion for Summary Judgment

### A.    Choice of Law

Several jurisdictions have a connection with the controversy in this case: Washington (where the alleged contract was made), CNMI (where the services were to be primarily rendered), Oregon (where the Herrons reside) and California (which the parties allegedly agreed would apply to their contract).

It is a  well-settled principle that a federal court sitting in diversity must use the choice of law rules of the original forum state to determine which state's substantive law applies. *Alaska Airlines, Inc. v. United Airlines, Inc.*, 902 F2d 1400, 1402 (9th Cir 1990), *appeal dismissed*, 1990 WL 288714 (9th Cir Dec 20, 1990), citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 US 487, 496 (1941), *cert. denied*, 316 US 685 (1942). As a result, this court must apply Oregon's law for the choice of law analysis.

Oregon common law dictates that before applying Oregon's choice of law, the court first must "determine whether the laws of the states having a connection with the controversy are in conflict" on a particular issue. *Lilienthal v. Kaufman*, 239 Or 1, 5, 395 P2d 543, 544 (1964). If there is no material difference, Oregon law applies. *Angelini v. Delaney*, 156 Or App 293, 300,

15 - FINDINGS AND RECOMMENDATIONS

966 P2d 223, 227 (1998), *review denied*, 328 Or 594, 987 P2d 514 (1999).  In cases where

material differences exist, Oregon's conflict-of-laws jurisprudence determines which state's laws

should apply.  This approach applies to all claims except contract claims, as discussed below.

### 1.    Choice of Law for Fraud and Racial Discrimination Claims

A comparison of the jurisprudence in Washington, CNMI, Oregon and California

conveys no material difference on the non-contract issues.[5]  With respect to the fraud claims, the

law in the four jurisdictions is similar.  *Compare Stiley v. Block*, 130 Wash 2d 486, 505, 925 P2d

194, 204 (1996); *Pangelinan v. Itaman*, 1994 WL 111281 at *4 (NMI March 21, 1994) (adopting

the elements of the RESTATEMENT (SECOND) OF TORTS, § 526) and *Boddy v. Guerrero*, 1997 WL

33480921 (NMI Oct 31, 1997), *appeal dismissed*, 179 F3d 714 (9th Cir 1999);[6] *Pollock v. D. R.*

*Horton, Inc. - Portland*, 190 Or App 1, 20, 77 P3d 1120, 1131 (2003); and *Lazar v. Superior*

*Court*, 12 Cal 4th 631, 638, 49 Cal Rptr 2d 377, 380-81 (1996).

The Herrons also allege a claim of race discrimination in violation of 42 USC § 1981.

This civil rights statute clearly applies to Oregon, Washington and California, and also is

enforced in CNMI.  *See Fernando v. Hotel Nikko Saipan, Inc.*, 1992 WL 350303 (D NMI Oct 1,

1992).

---

[5]  Neither party has argued that the laws of Iowa, where WFF is incorporated, apply here.

[6]  In *Boddy*, the trial court embraced the following fraudulent misrepresentation elements in its jury instructions:
"1. The defendant must have made a representation as to a past or existing material fact. 2. The representation must have been
false. 3. The defendant must have known that the representation was false when made or must have made the representation
recklessly without knowing whether it was true or false. 4. The defendant must have made the representation with the intent to
defraud the plaintiff, that is he must have made the representation for the purpose of inducing the plaintiff to rely upon it, and to
act or to refrain from acting in reliance thereon. 5. The plaintiff must have been unaware of the falsity of the representation, must
have acted on reliance on the truth of the representation, and must have been justified in relying upon the representation.6. As a
result of the reliance upon the truth of the representation, plaintiff must have sustained damage."  *See* Trial Opinion at *5.

Because there is no material difference in the laws of the four relevant jurisdictions, the court will apply Oregon law to resolve the non-contractual issues raised in WFF's motion for summary judgment.

### 2.    Choice of Law for Contract Claims

In 2001, the Oregon legislature codified its choice of law rules applicable to contracts, effective January 1, 2002.  ORS 81.100-.135; *see also* James A.R. Nafziger, *Oregon's Conflicts Law Applicable to Contracts*, Willamette L Rev 397 (Summer 2002) ("Nafziger").  Instead of applying ORS 81.100-.135, WFF urges this court to first apply Oregon's common law choice-of-law analysis.

ORS 81.100-.135 were intended to replace the rules of the RESTATEMENT (SECOND) OF THE LAW, Conflict of Laws (1971), which had previously guided Oregon's choice of law and largely displaced Oregon's common law choice-of-law jurisprudence which had been criticized for being a "jumble of rather ambiguous and unstable jurisprudence."  Nafziger, p. 1 & n6.  Clear language in the statute sets out its applicability and boundaries:  "ORS 81.100 to 81.135 govern *the choice of law applicable to any contract or part of a contract, when a choice between the laws of different states is at issue.*"  ORS 81.102 (emphasis added).  The statute expressly lists all the exceptions, *i.e.* situations when ORS 81.100 to 81.135 are not applicable, but remains silent as to the common law approach of applying Oregon law when there are no material differences with other interested states.  Oregon courts have not addressed whether the common law was supplemented or completely supplanted by the new statutes.  Upon examining the language of the statutes, their exceptions and its goals, this court concludes that they were

intended to replace the common law practice of applying Oregon law when there are no material differences between the interested states.[7]

### a.    Whether the Parties' Choice of California Law Applies

The Herrons contend that California law applies to the contract claims because Herron and Turner agreed to that term as part of the employment contract.  While WFF disputes any such agreement, the facts must be viewed in the light most favorable to the non-moving party, namely the Herrons.

Pursuant to ORS 81.120(a), "the contractual rights and duties of the parties are governed by the law or laws that the parties have chosen."  However, the choice of law must be "express or *clearly demonstrated from the terms of the contract*."  ORS 81.120(b) (emphasis added).  The court must examine the text and context of the contract as a whole in order to determine whether the choice of law provision is ambiguous.  *Industra/Matrix Joint Venture v. Pope & Talbot, Inc.*, 200 Or App 248, 254, 113 P3d 961, 965, *review allowed*, 339 Or 609, 127 P3d 650 (2005) (citation omitted).

The alleged choice of California law was neither express nor clearly demonstrated from the terms of the contract.  For example, it is unclear whether the choice of law applied to all or

---

[7]  The principles of contract formation in all four jurisdictions are based on the RESTATEMENT (SECOND) OF CONTRACTS (1981), which recognizes that objective intent, as evidenced by the express terms of the contract, rather than the subjective intent of the parties, controls interpretation.  *Compare Plumbing Shop, Inc. v. Pitts*, 67 Wash 2d 514, 517, 408 P2d 382, 384 (1965) (citation omitted) ("The Washington court has long adhered to the objective manifestation theory in construing the words and acts of alleged contractual parties"); *Isla Fin. Servs. v. Sablan*, 2001 WL 34883530 at *2 (NMI Dec 14, 2001) (citation omitted) ("In the absence of CNMI statutory authority governing the enforceability of contracts, "we must look to the common law as expressed in the Restatement of Contracts"); *Springer v. Powder Power Tool Corp.*, 220 Or 102, 110, 348 P2d 1112, 1115-16 (1960) ("This court subscribes to the objective theory of contracts."); *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal App 4th 944, 956 (2003), 135 Cal Rptr 2d 505, 514 (2003) (citation omitted) ("California recognizes the objective theory of contracts.")

18 - FINDINGS AND RECOMMENDATIONS

part of the alleged contract.  When asked whether he believed Washington law applies to this

case, even Herron admitted that the scope of the choice of law was ambiguous:

> A. *I wasn't actually sure which law would apply.*  I know that when we
> talked originally, Mr. Turner and I . . . that he said that he was going –
> when he got back to Orange County, he was going to have his assistant
> write it up, and he was also talking about writing up – not just our
> agreements, but he was talking about writing up or doing all the details for
> my travel to Saipan . . . And I asked him "Under California Law?"  And
> he said, "Yes."
>
>           * * *
>
> Q.  Is that your belief to this day, that California Law does in fact govern
> this alleged contract?
> A.  That's a hard legal conclusion, and the reason I say that is because *it
> depends on which part of the interactions in the agreements we're talking
> about*, did we – did the parties agree to a certain jurisdiction law?  Yes,
> California.  Would California's Law then apply for the fraud? I don't
> know [sic] really know yet.  I'm still researching that.  Maybe it's
> Washington law.

Herron Depo II, pp. 58-59 (emphasis added).

Therefore, the parties' alleged decision to apply California law is not sufficiently clear to

be recognized by this court under ORS 81.120.

### b.    Which Jurisdiction's Laws Apply

Under ORS 81.135(2)(b), if the parties have not made an effective choice of law,

"[c]ontracts for personal services are governed by the law of the state[8] where the services are to

be primarily rendered pursuant to the contract."  However, an exception applies if "a party

demonstrates that the application of that law would be clearly inappropriate under the principles

---

[8] "State means the United States, any state of the United States, any territory, possession or other jurisdiction of the United States, any Indian tribe, other Native American group or Native Hawaiian group that is recognized by federal law or formally acknowledged by a state of the United States, and any foreign country, including any territorial subdivision or other entity with its own system of laws."  ORS 81.100(2).

19 - FINDINGS AND RECOMMENDATIONS

of ORS 81.130."[9]  ORS 81.135(1).  WFF has not disputed the appropriateness of applying the law dictated by ORS 81.135(2)(b), although allowed by statute under the principles of ORS 81.130.  Therefore, the court will apply the law of the state where the employment services were to be primarily rendered.

The Herrons claim that performance of the contract was to take place primarily in Saipan, CNMI.  WFF disagrees, emphasizing that at the time the alleged contract was entered into, Herron claims that he was asked to start working on revising the lending law immediately while he was still in Oregon, and it was unclear when he would relocate to Saipan.  Oregon law applies to an employment contract "for services to be rendered primarily in Oregon by a resident of Oregon."  *See* ORS 81.105(3).  However, viewing the facts in the light most favorable to the Herrons, the services were to be rendered primarily by Herron in the CNMI.  As a result, the contract claims are governed by the laws of CNMI.

**B.      Fraud Claims (Second and Third Claims)**

**1.      Standing of Mrs. Herron and the Herron Children**

Standing is a procedural issue and the laws of the forum state must be applied.  *See Lilienthal*, 239 Or at 6, 395 P2d at 545 (procedural matters are governed by the law of the forum).  WFF challenges the standing of Mrs. Herron and the Herron children to bring fraud claims, asserting that Turner never made any misrepresentations to these parties because he never communicated with these parties.

---

[9]  Under ORS 81.130(3), the appropriateness of a law is determined by evaluating its relative strength and pertinence in "meeting the needs and giving effect to the policies of the interstate and international systems," and "facilitating the planning of transactions, protecting a party from undue imposition by another party, giving effect to justified expectations of the parties concerning which state's law applies to the issue and minimizing adverse effects on strong legal policies of other states."

However, direct misrepresentation is not always required.  Under Oregon law, plaintiffs must prove that the employer "made a representation to [the plaintiffs] . . . under circumstances that entitled [the spouses] to believe that [employer] had authorized [plaintiffs] to communicate the representation to [the spouses]."  *Meade v. Cedarapids, Inc.*, 164 F3d 1218, 1223 (9th Cir 1999), citing *Johnsen v. Mel-Ken Motors, Inc.*, 134 Or App 81, 894 P2d 540, 545 (1995).  In *Meade*, the court allowed an employee's spouse to bring a claim for misrepresentation against the employer for alleged misrepresentations made to the employee.  The court reasoned that "because spouses usually make decisions as a family unit rather than as separate individuals, it is likely that the process of deciding whether to relocate for a new job involves convincing the spouse that the positive qualities of the new job outweigh the difficulties caused to the family." *Id*, 164 F3d 1223.  Therefore, Mrs. Herron has standing to bring the Second Claim (fraud in the inducement) and Third Claim (fraud in the factum).  However, the same reasoning does not apply to the Herron children, who were not expected to be a part of the decision-making process to relocate; they have no standing to allege these claims.

### 2.    Legal Standard for Fraud Claims

Herron and his wife allege claims of fraud in the inducement and fraud in the factum against WFF.  Fraud claims generally require a showing by clear and convincing evidence that: "(1) the accused had falsely represented a material fact; (2) the accused knew that the representation was false; (3) the misrepresentation was made with the intent to induce the recipient to act or refrain from acting; (4) the recipient justifiably relied on the misrepresentation; and (5) the recipient was damaged by that reliance."  *Pollock*, 190 Or App at

20, 77 P3d at 1131 (citations omitted).[10]  The "justifiable reliance" element requires proof of the reasonableness of the reliance.  *Oregon Pub. Employees' Ret. Bd. ex rel. Oregon Pub. Employees' Ret. Fund v. Simat et al*, 191 Or App 408, 428, 83 P3d 350, 359 (2004), *review withdrawn*, 340 Or 411, --- P.3d ---- (Apr 12, 2006).  Whether the recipient justifiably relied on the misrepresentation is a conclusion of law.  *US National Bank v. Fought*, 291 Or 201, 222, 630 P2d 337, 349 (1981).

### 3. Analysis

After reviewing the evidence before it, this court finds no genuine issue of material fact as to whether Herron and his wife justifiably relied on the misrepresentation and suffered damage as a result of that reliance.  As a result, WFF's motion for summary judgment against the Second and Third Claims should be granted.

### a. Reliance Damages

In his affidavit, Herron states that in reliance on the alleged contract, he "began performing work, gave up potential clients, and prepared to move to Saipan."  Herron Aff, ¶ 37.  However, with respect to giving up potential clients, at the time of his deposition, Herron was unable to name any clients he had turned away and only remembered having to refer one unnamed personal injury client to another attorney.  Herron Depo, p. 260.  Later in his deposition, Herron testified that he may have turned away a private case or two, but had no specific recollection of it nor could he remember for sure whether he turned away any CIDC clients in anticipation of moving to Saipan.  Herron Depo II, pp. 46-47.

---

[10] Although some Oregon courts recognize nine, rather than five elements of fraud, the *Pollock* court did not perceive a substantive difference between the elements.  190 Or App at 20 n22, 77 P3d at 1131.

22 - FINDINGS AND RECOMMENDATIONS

In this regard, Herron's affidavit contradicts his deposition.  A party may not create a genuine issue of fact by submitting an affidavit directly contradicting his or her prior deposition testimony without any explanation for the contradiction.  *Henderson-Rubio v. The May Dept. Stores*, 53 Or App 575, 585 & n6, 632 P2d 1289, 1295 & n6 (1981).  "Not all discrepancies contained in an affidavit justify a court's refusal to give credence to such evidence."  *Id*.  Rather, the rule is limited to cases in which the "statements are clearly inconsistent and no attempt is made to explain the inconsistency."  *Id.*  Herron's statement in his affidavit and deposition are clearly inconsistent with respect to turning away clients, and Herron has offered no explanation for the inconsistency.  Therefore, the court will disregard his affidavit testimony as to turning away clients.

With respect to beginning work for WFF, Herron also states that he paid for printing and photocopies for the legal research he performed, gasoline to travel to and from the libraries where he performed the legal research, parking at the libraries, purchases of literature on legislative law and process to learn new skills, the cost of long distance phone calls to Turner and long distance calls to prepare to move to Saipan.  Herron Aff, ¶¶ 49-53.  However, he could not produce any copies of his legal research and did not keep notes.  Herron Depo I, pp. 34, 256-58; Herron Depo II, p. 114.  He states that he did most of the drafting in his head and did not record the time he spent researching.  Herron Depo I, pp. 33, 258.  He used the law library and did not have to pay for online legal research databases.  Herron Depo I, pp. 256, 259; Herron Depo II, p. 120.  Even without Herron's estimate of expenses incurred in performing work in reliance on any misrepresentation by Turner, it is clear that they were minimal.

Herron also made arrangements for his imminent move to Saipan.  In his affidavit, Herron states that he offered to pay Ira Nedosenko ("Nedosenko"), Mrs. Herron's niece, to be the nanny of his children in Saipan, and that Nedosenko accepted the offer.  Herron Aff, ¶ 42. However, Herron did not mention Nedosenko in his previous depositions.  In fact, at his second deposition, he was specifically asked whether he had described everything that he did in reliance of Turner's promises, and answered  "I would say, as I sit here now, what I can recall, yes." Herron Depo II, p. 48.  However, his affidavit is partly corroborated by Mrs. Herron's deposition.  She stated that she "was going to hire [her] niece to be . . . a nanny," and described a phone conversation with her mother, where she told the mother that she needed to hire Ira for a year.  Olga Herron Depo, pp. 62-63.  The mother did not think it was a good idea and offered to be the nanny herself.  *Id* at 63.  Mrs. Herron did not address whether she ever made the offer to Ira and if so, whether Ira accepted the offer.

Even accepting Mrs. Herron's testimony, this evidence of reliance must be disregarded. First, the identity of the parties to the alleged contract with Nedosenko is unknown.  It is unclear whether Herron or Mrs. Herron made the offer that was allegedly accepted.  Second, Herron fails to explain in his affidavit why he did not disclose this important contract to opposing counsel in his deposition, especially when he was asked to list his reliance damages.  Third, any contract with Nedosenko only gives rise to a potential lawsuit.  The Herrons have suffered no actual damages as a result of this alleged contract with Nedosenko.

In his affidavit, Herron also states that he made an appointment for his pregnant wife to undergo an amniocentesis and genetic screening of the amniotic fluid in anticipation of raising the baby in Saipan."  Herron Aff, ¶ 48.  However, it is far from clear how this act rises above the

level of *de minimus* damages.  Although the procedure carried some risk, Mrs. Herron suffered

no damages as a result.  Furthermore, she kept the appointment even after Turner had announced

his "plan to breach [the] contract."  *Id*.

Although Herron and his wife took various actions in reliance on the alleged contract,

this court concludes that they are, at best, *de minimis*.  Notably, Herron took no steps after May

6, 2004, to resign from his employment with CIDC or to close his private law practice, as one

would reasonably expect after accepting a new job starting immediately for another employer for

$250,000 a year.  Where reliance, even if it exists, is minimal, the plaintiff's claim fails to create

a disputed fact question. *See Angel v. Reider*, 71 Or App 10, 14, 691 P2d 151, 154 (1984).  Here

the Herrons' alleged damages are wholly insufficient to create a material issue of fact to support

their fraud claims.

**b.    Whether Any Reliance Was Justified**

Even if the Herrons have presented sufficient evidence of damages as a result of relying

on the alleged misrepresentation, their reliance was not reasonable.  The day after the parties met

and discussed the job in Saipan, Turner told Herron in a phone conversation that he needed to

talk to the CEO to "confirm,"  "go over" or "clarify" the details of Herron's hiring.  In a "thank

you" email to Turner later that day, Herron included information about his skills (such as being

well-versed in the UCC) because he did not want the CEO to find any reason to dislike what

Turner was doing.  Herron admitted that it was a possible scenario that the CEO would disagree

with Turner's actions.  Thus, Herron and his wife were aware of the potential that the CEO

would veto Turner's job offer as early as the day after the job offer.  As such, beginning the

morning of May 7, 2004 when the phone call took place, they could not reasonably rely on

Turner's job offer to substantially change their position until the CEO agreed with Turner's hiring decision.  They have offered no proof of damages caused by relying on Turner's representation between the evening of May 6 and the morning of May 7, 2004.  Therefore, their Second and Third Claims should be dismissed.

### C.    Contract Claims (First, Fourth and Fifth Claims)

WFF moves for summary judgment against the claims for breach of contract (First and Fourth Claims) and breach of the covenant or duty of good faith and fair dealing (Fifth Claim) because: (1) there was no mutual assent to the contract; (2) the alleged agreement is insufficiently definite to be enforced; and (3) the alleged agreement is barred by the statute of frauds.

### 1.    Standing of Mrs. Herron and the Herron Children

WFF challenges the standing of Mrs. Herron and the Herron children to bring contract claims (the First, Fourth and Fifth Claims) against it.  Neither Mrs. Herron nor the Herron children were parties to the alleged contract.  Therefore, the only way they can seek to enforce the contract would be as third-party beneficiaries.

Third-party beneficiaries are grouped into mutually exclusive categories: intended beneficiaries and incidental beneficiaries.  *Hale v. Groce*, 304 Or 281, 285, 744 P2d 1289, 1291 (1987), citing RESTATEMENT (SECOND) OF CONTRACTS, § 302 (1981).[11]  A third party who is merely an incidental beneficiary of a contract, rather than an intended beneficiary, is not entitled to enforce the promise either against the promisor or the person to whom the promise was made.

---

[11] Older cases still cite to the RESTATEMENT OF CONTRACTS § 133 (1932), which grouped third-party beneficiaries into three categories: creditor, donee, and incidental beneficiaries.  *Northwest Airlines v. Crosetti Bros*, 258 Or 340, 345-46, 483 P2d 70, 72-73 (1971).  By either classification, incidental beneficiaries acquire no rights under the contract.  *Id.*

*Haines v. Pacific Bancorporation*, 146 Or 407, 414, 30 P2d 763, 766 (1934) (citations omitted).
A "third party's right to enforce a contractual promise in its favor depends on the intention of the
parties to the contract." *Sisters of St. Joseph v. Russell*, 318 Or 370, 374, 867 P2d 1377, 1380
(1994). "Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is
an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate
to effectuate the intention of the parties and the circumstances indicate that the promisee intends
to give the beneficiary the benefit of the promised performance." RESTATEMENT (SECOND) OF
CONTRACTS § 302(1)(b) (1981). For example, in *Hale*, the unnamed but intended beneficiary of
a will was an intended beneficiary of the lawyer's promise to his client to name the beneficiary
in the will. In *Roberts v. Ellis*, 229 Or 609, 368 P2d 342 (1962), the wife was an intended
beneficiary of the husband's employment contract which required the husband's employer to pay
the wife, if she survived the husband, $1,000 per month for her lifetime.

Neither the terms of the alleged contract nor the circumstances accompanying the
formation of the contract afford any evidence that the parties intended Mrs. Herron and the
Herron children to be beneficiaries of the alleged contract. Therefore, as incidental beneficiaries,
Mrs. Herron and the Herron children have no standing to bring contract claims (the First, Fourth
and Fifth Claim) against WFF.

### 2.  Whether There Was Mutual Assent

WFF contends that no enforceable contract was created because there was no objective
manifestation of mutual assent to the contract.

### a.  Legal Standard

27 - FINDINGS AND RECOMMENDATIONS

As discussed above, CNMI law will be used to interpret Herron's contract claims.  In the absence of written law or local customary law to the contrary, CNMI courts apply "the rules of common law, as expressed in the restatements of the law approved by the American Law Institute and, to the extent not so expressed as generally understood and applied in the United States . . ."  7 CMC § 3401;  *see also Isla Fin. Servs.*, 2001 WL 34883530 at * 2 ("In the absence of CNMI statutory authority governing the enforceability of contracts, 'we must look to the common law as expressed in the Restatement of Contracts'" (citation omitted)).

Under CNMI law, "the essential elements of a contract are offer, acceptance, and consideration."  *Id*, citing RESTATEMENT (SECOND) OF CONTRACTS, § 17 (1981).  The formation of a contract "consists of a bargain where there is manifestation of mutual assent and consideration."  *Bank of Saipan v. Superior Court of Commonwealth of Northern Marianas*, 2001 WL 34876570 at * 7 (NMI Apr 21, 2001), citing RESTATEMENT (SECOND) OF CONTRACTS, § 17 (1979).

> Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.

RESTATEMENT (SECOND) OF CONTRACTS, § 27.

### b.    <u>Analysis</u>

First, WFF argues that because Herron knew that Turner had to confirm the details with the CEO, he could not have reasonably interpreted Turner's words as an offer.  However, WFF's argument is unconvincing.  At the time the parties met, Turner represented that he was

completely in charge of the expansion project in Saipan. Turner did not mention any contingent approval by the CEO until the day after Herron had accepted the offer.

Second, WFF suggests that Herron could not have interpreted Turner's words to be an offer since they were uttered between two strangers playing blackjack in a casino, during discussions lasting less than two hours, without the usual safeguards of a resume, interview and background check. As far-fetched as such a scenario may seem, a fact-finder could reasonably find that Turner, in his capacity as a vice-president of WFF, had apparent authority to engage in out-of-the-ordinary hiring practices. Moreover, Herron was told by Turner that he made some of his best business contacts in unusual places. The environment and procedure for hiring does not, as a matter of law, constitute a barrier to the formation of the contract.

Finally, WFF contends that, at best, the parties' May 6, 2004 discussion was a preliminary negotiation which would later be finalized in writing. Herron vehemently disagrees. As dictated by the RESTATEMENT (SECOND) OF CONTRACTS, § 27, oral manifestations of assent are sufficient to form a contract despite the parties' contemplation of a later written memorial. This is unless a party "knows or has reason to know" that the other does not intend to be bound by any obligation "until other terms have been assented to or until the whole has been reduced to another written form." *Id* at Comment b. Moreover, the oral manifestations of assent do not create a contract if the circumstances show that the agreements are preliminary negotiations and the parties only intend to be bound by the terms upon the execution of the writing. *Id*; *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F3d 309, 314 (9th Cir), *cert denied*, 519 US 865 (1996).

While Turner told Herron that his assistant would write up the agreement, Herron understood that the contract was formed orally on May 6, 2004, not at the time it would be

29 - FINDINGS AND RECOMMENDATIONS

reduced to writing.  However, "[e]ven though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain."  RESTATEMENT (SECOND) OF CONTRACTS, § 33(1); *see also Riley v. Pub. Sch. Sys*., 1994 WL 111129 at * 2 (NMI Feb 9, 1994) ("The intent of contracting parties is generally presumed to be encompassed by the plain language of contract terms") (citation omitted).

If a reasonable trier of fact could find that the parties had assented orally on all material terms, it also could find that the parties intended that the future writing would merely memorialize their binding agreement.  Therefore, the oral manifestation of mutual assent may be enough to create an enforceable contract, if the terms are sufficiently certain.

### 3.    Whether The Terms of the Agreement Are Sufficiently Definite

#### a.    Legal Standard

Under the objective theory of contracts, a manifestation of intention does not form a contract unless the terms of the contract are reasonably certain.  *Id*.  This court has found no CNMI written or customary law stating what the essential terms of an employment contract should be, and the parties have not cited any such authority.  Therefore, the RESTATEMENT (SECOND) OF CONTRACTS provides the relevant legal standards.

Terms are "reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy."  RESTATEMENT (SECOND) OF CONTRACTS, § 33(2).  However, even where "one or more terms are missing or are left to be agreed upon," "the actions of the parties may show conclusively that they have intended to conclude a binding agreement."  *Id* at Comment (a).  When faced with such a situation, courts attempt, "if possible,

to attach a sufficiently definite meaning to the bargain." *Id*.  On the other hand, if "essential

terms" are uncertain to the extent that courts cannot tell "whether the agreement has been kept or

broken," then there is no contract.  *Id*.  "Even when the parties intend to enter into a contract,

uncertainty may be so great as to frustrate their intention.  Thus a promise by A to give B

employment, even though consideration is paid for it, does not provide a basis for any remedy if

neither *the character of the employment*, nor the compensation thereof is stated . . ."  *Id* at

Comment (f) (emphasis added).

In cases where essential terms are missing, partial performance or other reliance may still

enforce the agreement.  *Id*.  Usage of trade and course of dealing between the parties may also

supply precision to an offer that is too indefinite.  *Id*.

### b.    Analysis

Viewing the facts in the light most favorable to Herron, the only material and definite

terms are the parties to the contract (Herron and WFF), the consideration (performance of work

in exchange for $250,000 per year) and the start date for performance (immediately).[12]

As discussed in more detail below, the duration of the contract is ambiguous: whether it

is one year exactly, slightly more than one year (the work done in Oregon plus one year of

employment in Saipan), or two years.  However, "the lack of an agreed upon duration [of

employment] does not invalidate the contract itself."  *Spriggs v. Diamond Auto Glass*, 165 F3d

1015, 1019 (4th Cir 1999), *appeal after remand*, 242 F3d 179 (4th Cir 2001), *citing* the

RESTATEMENT (SECOND) OF CONTRACTS, § 33, Comment (d), Illustration 6.

---

[12]  The RESTATEMENT (SECOND) OF CONTRACTS, § 33, Comment (d), Illustration 3, provides that "[v]alid contracts are often made which do not specify the time of performance. . . [for example] A and B promise that certain performances shall be mutually rendered by them "immediately" or "at once," or "promptly" . . .  All these promises are sufficiently definite to form contracts."

31 - FINDINGS AND RECOMMENDATIONS

The scope of Herron's job duties also is ambiguous. Herron was hired to revise the "lending law" of CNMI in order to make it more "lender friendly," and to try and win cases. Herron alleges that he immediately began performance of the contract, researching and revising "the lending law of CNMI," although he is unable to offer any proof that he did and to identify which statutes the parties had in mind. Nor can Herron explain what "winning in court" within the first year actually means to the parties. It could mean winning more than 50% of the time or only winning once. It is uncertain what would happen if within the first year, no cases in which WFF was a party actually went to trial, and whether winning "within the first year" encompasses a year starting immediately or a year upon Herron's arrival in Saipan.

In addition, certain terms are completely missing from the contract: whether Herron would be an employee or a contractor, whether the employment would be full-time or part-time, whether he would be eligible for benefits, when he would be moving to Saipan, whether or when he would be taking the CNMI bar examination, what kind of trials he would handle and which lending law he was to revise and lobby for. There is no partial performance, other reliance, usage or trade or course of dealing sufficient to supply these missing terms.

Whether the ambiguous terms and the missing terms are essential to the formation of a valid contract depends on whether the existing definite terms provide a basis for determining the existence of a breach and for giving an appropriate remedy. On balance, this court concludes that the contact was not sufficiently definite to be enforceable. However, even if it is sufficiently definite, the contract fails under the statute of frauds, as discussed next.

///

///

32 - FINDINGS AND RECOMMENDATIONS

4.        **Statute of Frauds**

WFF alleges that even if a contract was formed, it is void under the statute of frauds. Prior to 1983, no statute of frauds existed in CNMI.  *See* 2 CMC § 4911.  In 1983 the CNMI legislature recognized "a need for contracts and other agreements to be in writing" and adopted the statute of frauds.  2 CMC §§ 4911-4916.  While its goal was mainly to deal with land and real property issues (hence its location within the Land Resources title), the statute of frauds language is sufficiently broad to encompass other contracts and transactions.  2 CMC § 4914.  It states in part that "[a]n agreement that by its terms is not to be performed within a year from the making thereof" is invalid "unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged or by his agent."  2 CMC § 4914(a).

WFF relies on Herron's own words to allege that if there was a contract, it was made for a period of two years.  In a May 29, 2004 email to Turner, Herron demanded enforcement of the employment contract, alleging that "we have a contract for a minimum of two years."  Buchanan Decl, Ex 8.

In response, Herron alleges that on May 6, 2004, after he accepted Turner's offer and had an enforceable contract, Turner asked him to commit to employment for two years in order to justify the expense of sending him to Saipan.  Although Herron agreed to the request, he argues that his promise to commit to two years is unenforceable because Turner offered no additional consideration.  It is the law of many states that to be binding, modification of a contract requires new consideration.  *See, e.g. Anderson v. Divito*, 138 Or App 272, 281-82, 908 P2d 315, 322 (1995) (citation omitted).  CNMI law is silent as to whether contract modification requires additional consideration.  Under the RESTATEMENT (SECOND) OF CONTRACTS § 89, a promise

modifying a duty under a contract not fully performed on either side is binding, even if the promise is without new consideration, if: "(a) the modification is fair and equitable in view of circumstances not anticipated by the parties when the contract was made; or (b) to the extent provided by statute; or (c) to the extent that justice requires enforcement in view of material change of position in reliance on the promise."  As none of these circumstances are present here, the general rule applies, and a contract may not be modified without new consideration.

Herron alleges that he believed he was a party to two oral contracts with WFF: one for one year, and the other for two years, which was part of the contingent lifetime contract. Construing the terms in the light most favorable to Herron, the contract could be interpreted as a one-year contract for guaranteed employment and, contingent on performance, with a guarantee of lifetime employment.  If the lifetime guarantee materialized, Herron still had the option to leave after two years (one year into the lifetime contract).  However, such an interpretation of the terms contradicts sharply with Herron's own words that he had a contract for a minimum of two years.  When the non-moving party presents contradictory versions of the facts, it makes it difficult to view the facts in the light most favorable to it.

Even if Herron entered into a one-year employment contract, WFF contends that the contract could not be performed within one year of its making because it was unclear when Herron would have to move to Saipan to begin his employment.  Herron responds that performance of the one-year contract began right away because he was told by Turner to begin work on revising the CNMI lending law immediately.  Not only has Herron submitted no written evidence that he actually began performance, in yet another contradiction he describes the contract as follows: "Defendant only guaranteed plaintiff Bart Herron one year of employment *in*

*Saipan*."  Plaintiffs' Memorandum in Response to Defendant's Motion for Summary Judgment and in Support of Plaintiffs' Cross-Motion for Summary Judgment, p. 12.  Moreover, when asked what was his understanding of the agreement as of May 6, 2004, Herron explained:  "[a]t least for a year I would be *in Saipan* without any worry about a job.  If I did well, I would always have a job.  If I didn't do well, I would be cut loose."  Herron Depo I, p. 76 (emphasis added).  Adding one year of employment *in Saipan* to begin on an unspecified date to the period of legal research conducted in Oregon results in a contract that cannot be performed within a year of its making.  As a result, it is void under the statute of frauds and Herron's claims to enforce the contract should be dismissed.

### 5. Breach of the Duty of Good Faith and Fair Dealing

Herron alleges that WFF, through its agent, breached its duty of good faith and fair dealing.  Under the RESTATEMENT (SECOND) OF CONTRACTS § 205, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."  However, the applicability of this implied duty is limited:  "[§ 205] . . . does not deal with good faith in the *formation of a contract*."  *Id* at Comment (c) (emphasis added).  Because the statute of frauds makes the alleged contract void, there is no contract upon which to base an implied duty of good faith and fair dealing.  *See Orthomet, Inc. v. A.B. Medic., Inc.*, 990 F2d 387, 392 (8th Cir 1993); *Arnold & Assoc., Inc. v. Misys Healthcare Sys.*, 275 F Supp 2d 1013, 1026 (D Ariz 2003).  Therefore, the Fifth Claim should be dismissed.

### D. Racial Discrimination Under 42 USC § 1981 ("Sixth Claim")

The Herrons allege that Turner was motivated by racial discrimination in not hiring Herron, and, thus, WFF violated 42 USC § 1981.

1.    **Standing of Mrs. Herron and the Herron Children**

WFF argues that Mrs. Herron and the Herron children have no standing to bring a claim of racial discrimination under 42 USC § 1981.  This court agrees. Neither Mrs. Herron nor the Herron children are "real parties in interest" under FRCP 17(a).  They have not alleged that they were the victims of racial discrimination through any adverse employment decision. Accordingly, Herron is the only proper party as to the 42 USC § 1981 claim, and the Sixth Claim should be dismissed as to Mrs. Herron and the Herron children.

2.    **Legal Standard**

42 USC § 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings . . . as is enjoyed by white citizens . . . ."  This statute was enacted in an effort to address the problem of racial discrimination against African-Americans.  *See McDonald v. Santa Fe Trail*, 427 US 273 (1976).  The 1991 amendments clarified that the phrase to "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 USC § 1981(b).

This statute can be violated only by intentional discrimination, also known as "disparate treatment."  *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 US 375, 391 (1982).  Claims under § 1981 are analyzed using the same legal principles as are claims of disparate treatment under Title VII of the Civil Rights Act of 1964, 42 USC § 2000e *et seq.  Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F3d 840, 850 (9th Cir 2004).

36 - FINDINGS AND RECOMMENDATIONS

To survive summary judgment on a race discrimination claim, the plaintiff must offer evidence that "give[s] rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 US 248, 253 (1981). A plaintiff who relies on circumstantial evidence of discrimination may establish a *prima facie* case of discrimination through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 US 792 (1973).

The plaintiff first must satisfy his *prima facie* burden by proving that: (1) he or she belongs to a class protected by Title VII or 42 USC § 1981; (2) the plaintiff applied and was qualified for a job for which the employer was seeking applicants; (3) despite being qualified, the plaintiff was rejected; and (4) after the plaintiff's rejection, the position remained open and the employer either continued to seek applicants from persons of comparable qualifications, or filled the position with an employee not of the plaintiff's protected class. *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F3d 1027, 1038 (9th Cir 2005), citing *McDonnell Douglas Corp.* 411 US at 802. Once the plaintiff satisfies a *prima facie* case, the burden of production shifts to the defendant to establish a legitimate nondiscriminatory reason for its failure to hire the plaintiff. If the defendant meets this burden, the burden shifts back to the plaintiff to produce sufficient evidence to raise a genuine issue of material fact as to whether the employer's alleged reason for the adverse employment decision is a pretext for a discriminatory motive. *Id*.[13]

However, if a plaintiff offers direct evidence of discrimination, then the *McDonnell Douglas* test is inapplicable. *Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F3d 802, 812 (9th Cir 2004), *cert denied*, 544 US 974 (2005). "'Direct evidence is evidence which, if believed,

---

[13] The plaintiff may assert that either the employer's failure to hire arose from a single illegitimate motive or that the decision resulted from both legitimate and illegitimate motives ("mixed motives theory"). Because Herron does not raise the mixed motives theory, the court will not address it.

proves the fact [of discriminatory animus] without inference or presumption.'"  *Dominguez-Curry*, 424 F3d at 1038, quoting *Godwin v. Hunt Wesson, Inc.*, 150 F3d 1017, 1221 (9th Cir 1998) (alterations in original, quotations and citations omitted).  "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer."  *Coghlan v. Am. Seafoods Co.*, 413 F3d 1090, 1095 (9th Cir 2005).  If the plaintiff "offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial . . . it need be 'very little [evidence].'"  *Godwin*, 150 F3d at 1221 (citation omitted).

## 2.    <u>Analysis</u>

According to Herron, when Turner offered him the job on May 6, 2004, he said: "I don't have anybody white there" and that Herron would be a minority in Saipan.  Herron Depo II, p. 24.  Turner "seemed to believe it was maybe a problem from the tone of his voice."  *Id* at 25.  Herron also states that later, after things turned "sour, and [Herron] realized that [Turner] wasn't intending to have [Herron] go there," the two were talking on the phone and Turner explained that he "cannot bring anybody in from the outside, not somebody white" because "[t]hey will block us, the people already there."  *Id* at 25-27.

Because Turner allegedly made statements referring to Herron's race as the reason for not hiring him, this constitutes direct evidence of discriminatory motive.  Although such evidence would generally create the necessary inference of discrimination to avoid summary judgment, it does not do so in this case.  For discrimination to exist with respect to hiring, a job must exist.  Although Turner offered to hire Herron for a job in Saipan, Herron has offered absolutely no evidence that the position in Saipan existed and remained open and that WFF

continued to seek applicants of comparable qualifications or hired someone outside of Herron's protected class, *i.e.* of another race. To the contrary, WFF has submitted evidence that there was, in fact, no job opening in Saipan and that it hired no one to fill it. Turner Decl, ¶ 6 ("To my knowledge, there has not been any effort to have [consumer lending law in Saipan] revised since [approximately 1998 to 2001] to make it more "user-friendly" or otherwise change that law"); *Id* at ¶ 7 ("To my knowledge, the Company [WFF] has not had involvement in any trials in the CNMI since it opened its branch there in 1997"). Herron has not countered with any contrary evidence that WFF assigned duties in Saipan to in-house counsel, divided the job between new or existing employees, or in any other way manipulated its employment to avoid hiring Herron because he was white. Instead, the only evidence is that Turner foolishly offered to hire Herron for a job that simply did not exist and later tried to avoid having that fact disclosed to WFF by coming up with another reason not to hire Herron with the hope that Herron would believe it.

A person cannot be held liable for race discrimination by refusing to hire someone based on race for a non-existent job. Discrimination in such a case is purely illusory. Therefore, the Sixth Claim should be dismissed.

///

///

///

///

///

///

///

39 - FINDINGS AND RECOMMENDATIONS

**RECOMMENDATION**

For the reasons stated above, Wells Fargo's Motion for Summary Judgment (docket # 47) should be GRANTED, and the Herrons' Cross-Motion for Summary Judgment (docket #52) and Amended Cross-Motion for Summary Judgment (docket # 56) should be DENIED. Accordingly, a judgment should be entered dismissing this case.

**SCHEDULING ORDER**

Objections to this Findings and Recommendation, if any, are due June 12, 2006.  If no objections are filed, then the Findings and Recommendation will be referred to a district court judge and go under advisement on that date.

If objections are filed, then the response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation(s) will be referred to a district court judge and go under advisement.

DATED this 22nd day of May, 2006.

s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

40 - FINDINGS AND RECOMMENDATIONS